# CLARK, FIELD OFFICE DIRECTOR, SEATTLE, IMMIGRATION AND CUSTOMS ENFORCE-MENT, ET AL. v. MARTINEZ

No. 03–878.   Argued October 13, 2004—Decided January 12, 2005*

*Together with No. 03–7434, *Benitez* v. *Rozos, Field Office Director, Miami, Immigration and Customs Enforcement,* on certiorari to the United States Court of Appeals for the Eleventh Circuit.

SCALIA, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 387. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined as to Part I-A, *post*, p. 388.

*Deputy Solicitor General Kneedler* argued the cause for petitioners in No. 03–878 and respondent in No. 03–7434. With him on the briefs were *Acting Solicitor General Clement,* former *Solicitor General Olson, Assistant Attorney General Keisler, Patricia A. Millett,* and *Donald E. Keener.*

*Christine Stebbins Dahl,* by appointment of the Court, 541 U. S. 986, argued the cause for respondent in No. 03–878. With her on the brief was *Stephen R. Sady.*

*John S. Mills,* by appointment of the Court, 541 U. S. 1084, argued the cause for petitioner in No. 03–7434. With him on the briefs were *Tracy S. Carlin* and *Rebecca B. Creed.*†

†Briefs of *amici curiae* urging reversal in No. 03–7434 were filed for the American Bar Association by *Dennis W. Archer, John J. Gibbons, Lawrence S. Lustberg, Jonathan L. Hafetz,* and *Philip G. Gallagher;* for the

JUSTICE SCALIA delivered the opinion of the Court.

An alien arriving in the United States must be inspected by an immigration official, 66 Stat. 198, as amended, 8 U. S. C. § 1225(a)(3), and, unless he is found "clearly and beyond a doubt entitled to be admitted," must generally undergo removal proceedings to determine admissibility, § 1225(b)(2)(A). Meanwhile the alien may be detained, subject to the Secretary's discretionary authority to parole him into the country. See § 1182(d)(5); 8 CFR § 212.5 (2004). If, at the conclusion of removal proceedings, the alien is determined to be inadmissible and ordered removed, the law provides that the Secretary of Homeland Security "shall remove the alien from the United States within a period of 90 days," 8 U. S. C. § 1231(a)(1)(A). These cases concern the Secretary's authority to continue to detain an inadmissible alien subject to a removal order *after* the 90-day removal period has elapsed.

American Civil Liberties Union by *Judy Rabinovitz, Lucas Guttentag, Steven R. Shapiro, Paul A. Engelmayer,* and *David Sapir Lesser;* for the American Immigration Law Foundation Legal Action Center et al. by *George E. Quillin, G. Michael Halfenger,* and *Michael D. Leffel;* for the Florida Immigrant Advocacy Center et al. by *Stephen F. Hanlon;* for the Lawyers Committee for Human Rights et al. by *Steven E. Fineman, Bill Lann Lee,* and *Deborah Pearlstein;* for Legal and Service Organizations by *Joseph F. Tringali;* for the North Carolina Justice and Community Development Center by *James E. Coleman, Jr.;* and for Regina Germain et al. by *David J. Bodney.*

*Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging affirmance in No. 03–7434 and reversal in No. 03–878.

Briefs of *amici curiae* urging affirmance in No. 03–878 were filed for the Cuban American Bar Association et al. by *Catherine E. Stetson; William H. Johnson,* and *Gilbert Paul Carrasco;* for National Refugee Resettlement and Advocacy Organizations by *Peter M. Friedman;* for Religious Organizations by *Isabelle M. Carrillo;* and for Stuart E. Eizenstat et al. by *David H. Remes.*

*Jonathan J. Ross* and *Melford O. Cleveland* filed a brief for Law Professors as *amici curiae* in No. 03–7434.

I

Sergio Suarez Martinez (respondent in No. 03–878) and Daniel Benitez (petitioner in No. 03–7434) arrived in the United States from Cuba in June 1980 as part of the Mariel boatlift, see *Palma* v. *Verdeyen,* 676 F. 2d 100, 101 (CA4 1982) (describing circumstances of Mariel boatlift), and were paroled into the country pursuant to the Attorney General's authority under 8 U. S. C. § 1182(d)(5).[1]  See Pet. for Cert. in No. 03–878, p. 7; *Benitez* v. *Wallis,* 337 F. 3d 1289, 1290 (CA11 2003).  Until 1996, federal law permitted Cubans who were paroled into the United States to adjust their status to that of lawful permanent resident after one year.  See Cuban Refugee Adjustment Act, 80 Stat. 1161, as amended, notes following 8 U. S. C. § 1255.  Neither Martinez nor Benitez qualified for this adjustment, however, because, by the time they applied, both men had become inadmissible because of prior criminal convictions in the United States.  When Martinez sought adjustment in 1991, he had been convicted of assault with a deadly weapon in Rhode Island and burglary in California, Pet. for Cert. in No. 03–878, at 7; when Benitez sought adjustment in 1985, he had been convicted of grand theft in Florida, 337 F. 3d, at 1290.  Both men were convicted of additional felonies after their adjustment applications were denied: Martinez of petty theft with a prior conviction (1996), assault with a deadly weapon (1998), and attempted oral copulation by force (1999), see Pet. for Cert. in No. 03–878, at 7–8; Benitez of two counts of armed robbery, armed burglary of a conveyance, armed burglary of a structure, aggravated battery, carrying a concealed firearm,

---

[1] The authorities described herein as having been exercised by the Attorney General and the Immigration and Naturalization Service (INS) now reside in the Secretary of Homeland Security (hereinafter Secretary) and divisions of his Department (Bureau of Immigration and Customs Enforcement and Bureau of Citizenship and Immigration Services).  See Homeland Security Act of 2002, §§ 441(2), 442(a)(3), 451(b), 116 Stat. 2192, 2193, 2196, 6 U. S. C. §§ 251(2), 252(a)(3), 271(b) (2000 ed., Supp. II).

unlawful possession of a firearm while engaged in a criminal offense, and unlawful possession, sale, or delivery of a firearm with an altered serial number (1993), see 337 F. 3d, at 1290–1291.

The Attorney General revoked Martinez's parole in December 2000. Martinez was taken into custody by the INS, and removal proceedings were commenced against him. Pet. for Cert. in No. 03–878, at 8. An Immigration Judge found him inadmissible by reason of his prior convictions, § 1182(a)(2)(B), and lack of sufficient documentation, § 1182(a)(7)(A)(i)(I), and ordered him removed to Cuba. Martinez did not appeal. Pet. for Cert. in No. 03–878, at 8. The INS continued to detain him after expiration of the 90-day removal period, and he remained in custody until he was released pursuant to the District Court order that was affirmed by the Court of Appeals' decision on review here. *Id.*, at 9.

Benitez's parole was revoked in 1993 (shortly after he was imprisoned for his convictions of that year), and the INS immediately initiated removal proceedings against him. In December 1994, an Immigration Judge determined Benitez to be excludable and ordered him deported under §§ 1182(a)(2)(B) and 1182(a)(7)(A)(i)(I) (1994 ed. and Supp. V).[2] 337 F. 3d, at 1291. Benitez did not seek further review. At the completion of his state prison term, the INS took him into custody for removal, and he continued in custody after expiration of the 90-day removal period. *Ibid.* In September 2003, Benitez received notification that he was eligible for parole, contingent on his completion of a drug-

---

[2] Before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–546, aliens ineligible to enter the country were denominated "excludable" and ordered "deported." 8 U. S. C. §§ 1182(a), 1251(a)(1)(A) (1994 ed.); see *Landon* v. *Plasencia*, 459 U. S. 21, 25–26 (1982). Post-IIRIRA, such aliens are said to be "inadmissible" and held to be "removable." 8 U. S. C. §§ 1182(a), 1229a(e)(2) (2000 ed.).

abuse treatment program. Letter from Paul D. Clement, Acting Solicitor General, to William K. Suter, Clerk of Court, 1 (Nov. 3, 2004). Benitez completed the program while his case was pending before this Court, and shortly after completion was paroled for a period of one year. *Ibid.* On October 15, 2004, two days after argument in this Court, Benitez was released from custody to sponsoring family members.[3]  *Id.,* at 2.

Both aliens filed a petition for a writ of habeas corpus under 28 U. S. C. § 2241 to challenge their detention beyond the 90-day removal period. In Martinez's case, the District Court for the District of Oregon accepted that removal was not reasonably foreseeable, and ordered the INS to release Martinez under conditions that the INS believed appropriate. *Martinez* v. *Smith,* No. CV 02–972–PA (Oct. 30, 2002), App. to Pet. for Cert. in No. 03–878, p. 2a. The Court of Appeals for the Ninth Circuit summarily affirmed, citing its decision in *Xi* v. *INS,* 298 F. 3d 832 (2002). *Martinez* v. *Ashcroft,* No. 03–35053 (Aug. 18, 2003), App. to Pet. for Cert. in No. 03–878, at 1a. In Benitez's case, the District Court for the Northern District of Florida also concluded that removal would not occur in the "foreseeable future," but nonetheless denied the petition. *Benitez* v. *Wallis,* Case No. 5:02cv19 MMP (July 11, 2002), pp. 2, 4, App. in

---

[3] Despite Benitez's release on a 1-year parole, this case continues to present a live case or controversy. If Benitez is correct, as his suit contends, that the Government lacks the authority to continue to detain him, he would have to be released, and could not be taken back into custody unless he violated the conditions of release (in which case detention would be authorized by § 1253), or his detention became necessary to effectuate his removal (in which case detention would once again be authorized by § 1231(a)(6)). His current release, however, is not only limited to one year, but subject to the Secretary's discretionary authority to terminate. See 8 CFR § 212.12(h) (2004) (preserving discretion to revoke parole). Thus, Benitez "continue[s] to have a personal stake in the outcome" of his petition. *Lewis* v. *Continental Bank Corp.,* 494 U. S. 472, 477–478 (1990) (internal quotation marks omitted).

No. 03–7434, pp. 45, 48. The Court of Appeals for the Eleventh Circuit affirmed, agreeing with the dissent in *Xi*. 337 F. 3d 1289 (2003). We granted certiorari in both cases. *Benitez* v. *Mata*, 540 U. S. 1147 (2004); *Crawford* v. *Martinez*, 540 U. S. 1217 (2004).

## II

Title 8 U. S. C. § 1231(a)(6) provides, in relevant part, as follows:

> "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the [Secretary] to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."

By its terms, this provision applies to three categories of aliens: (1) those ordered removed who are inadmissible under § 1182, (2) those ordered removed who are removable under § 1227(a)(1)(C), § 1227(a)(2), or § 1227(a)(4), and (3) those ordered removed whom the Secretary determines to be either a risk to the community or a flight risk. In *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), the Court interpreted this provision to authorize the Attorney General (now the Secretary) to detain aliens in the second category only as long as "reasonably necessary" to remove them from the country. *Id.*, at 689, 699. The statute's use of "may," the Court said, "suggests discretion," but "not necessarily . . . unlimited discretion. In that respect the word 'may' is ambiguous." *Id.*, at 697. In light of that perceived ambiguity and the "serious constitutional threat" the Court believed to be posed by indefinite detention of aliens who had been admitted to the country, *id.*, at 699, the Court interpreted the statute to permit only detention that is related to the statute's "basic purpose [of] effectuating an alien's removal," *id.*, at 696–699.

"[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized." *Id.*, at 699. The Court further held that the presumptive period during which the detention of an alien is reasonably necessary to effectuate his removal is six months; after that, the alien is eligible for conditional release if he can demonstrate that there is "no significant likelihood of removal in the reasonably foreseeable future." *Id.*, at 701.

The question presented by these cases, and the question that evoked contradictory answers from the Ninth and Eleventh Circuits, is whether this construction of § 1231(a)(6) that we applied to the second category of aliens covered by the statute applies as well to the first—that is, to the category of aliens "ordered removed who [are] inadmissible under [§] 1182." We think the answer must be yes. The operative language of § 1231(a)(6), "may be detained beyond the removal period," applies without differentiation to all three categories of aliens that are its subject. To give these same words a different meaning for each category would be to invent a statute rather than interpret one. As the Court in *Zadvydas* recognized, the statute can be construed "literally" to authorize indefinite detention, *id.*, at 689, or (as the Court ultimately held) it can be read to "suggest [less than] unlimited discretion" to detain, *id.*, at 697. It cannot, however, be interpreted to do both at the same time.

The dissent's belief that *Zadvydas* compels this result rests primarily on that case's statement that "[a]liens who have not yet gained initial admission to this country would present a very different question," *id.*, at 682. See *post*, at 390, 393 (opinion of THOMAS, J.). This mistakes the reservation of a question with its answer. Neither the opinion of the Court nor the dissent in *Zadvydas* so much as hints that the Court adopted the novel interpretation of § 1231(a)(6) proposed by today's dissent. The opinion in that case con-

sidered whether § 1231(a)(6) permitted the Government to detain removable aliens indefinitely; relying on ambiguities in the statutory text and the canon that statutes should be interpreted to avoid constitutional doubts, the opinion held that it did not. Despite the dissent's repeated claims that § 1231(a)(6) could not be given a different reading for inadmissible aliens, see *Zadvydas, supra,* at 710, 716–717 (opinion of KENNEDY, J.), the Court *refused to decide* that question—the question we answer today. It is indeed different from the question decided in *Zadvydas,* but because the statutory text provides for no distinction between admitted and nonadmitted aliens, we find that it results in the same answer.[4]

The dissent's contention that our reading of *Zadvydas* is "implausible," *post,* at 389, is hard to reconcile with the fact that it is the identical reading espoused by the *Zadvydas* dissenters, who included the author of today's dissent. Worse still, what the *Zadvydas* dissent *did* find "not . . . plausible" was precisely the reading adopted by today's dissent:

> "[T]he majority's logic might be that inadmissible and removable aliens can be treated differently. Yet it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not to another. The text does not admit of this possibility. As a result, it is difficult to see why '[a]liens who have not yet gained initial admission to this country would present a very differ-

---

[4] The dissent is quite wrong in saying, *post,* at 390, that the *Zadvydas* Court's belief that § 1231(a)(6) did not apply to all aliens is evidenced by its statement that it did not "consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention," 533 U. S., at 696. The Court's interpretation of § 1231(a)(6) did not affect the detention of alien terrorists for the simple reason that sustained detention of alien terrorists is a "special arrangement" authorized by a different statutory provision, 8 U. S. C. § 1537(b)(2)(C). See *Zadvydas, supra,* at 697.

ent question.'" 533 U. S., at 710–711 (opinion of KEN-NEDY, J.).

The *Zadvydas* dissent later concluded that the release of "Mariel Cubans and other illegal, inadmissible aliens . . . would seem *a necessary consequence of the majority's construction of the statute.*" *Id.*, at 717 (emphasis added). Tellingly, the *Zadvydas* majority did not negate either charge.

The Government, joined by the dissent, argues that the statutory purpose and the constitutional concerns that influenced our statutory construction in *Zadvydas* are not present for aliens, such as Martinez and Benitez, who have not been admitted to the United States. Be that as it may, it cannot justify giving the *same* detention provision a different meaning when such aliens are involved. It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern. See, *e. g., Leocal* v. *Ashcroft, ante*, at 11–12, n. 8 (explaining that, if a statute has criminal applications, "the rule of lenity applies" to the Court's interpretation of the statute even in immigration cases "[b]ecause we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context"); *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505, 517–518, and n. 10 (1992) (plurality opinion) (employing the rule of lenity to interpret "a tax statute . . . in a civil setting" because the statute "has criminal applications"); *id.*, at 519 (SCALIA, J., concurring in judgment) (also invoking the rule of lenity). In other words, when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of con-

stitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.[5]

The dissent takes issue with this maxim of statutory construction on the ground that it allows litigants to "attack. statutes as constitutionally invalid based on constitutional doubts concerning other litigants or factual circumstances" and thereby to effect an "end run around black-letter constitutional doctrine governing facial and as-applied constitutional challenges." *Post*, at 396. This accusation misconceives—and fundamentally so—the role played by the canon of constitutional avoidance in statutory interpretation. The canon is not a method of adjudicating constitutional questions by other means. See, *e. g., NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 502 (1979) (refusing to engage in extended analysis in the process of applying the avoidance canon "as we would were we considering the constitutional issue"); see also Vermeule, Saving Constructions, 85 Geo. L. J. 1945, 1960–1961 (1997) (providing examples of cases where the Court construed a statute narrowly to avoid a constitutional question ultimately resolved in favor of the broader reading). Indeed, one of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions. It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.

[5] Contrary to the dissent's contentions, *post*, at 394, our decision in *Salinas* v. *United States*, 522 U. S. 52 (1997), is perfectly consistent with this principle of construction. In *Salinas*, the Court rejected the petitioner's invocation of the avoidance canon because the text of the statute was "unambiguous on the point under consideration." *Id.*, at 60. For this reason, the Court squarely addressed and rejected any argument that the statute was unconstitutional as applied to the petitioner. *Id.*, at 61 (holding that, under the construction adopted by the Court, "the statute is constitutional as applied in this case").

See *Rust* v. *Sullivan,* 500 U. S. 173, 191 (1991); *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988). The canon is thus a means of giving effect to congressional intent, not of subverting it. And when a litigant invokes the canon of avoidance, he is not attempting to vindicate the constitutional rights of others, as the dissent believes; he seeks to vindicate his own *statutory* rights. We find little to recommend the novel interpretive approach advocated by the dissent, which would render every statute a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case. Cf. *Harris* v. *United States,* 536 U. S. 545, 556 (2002) (rejecting "a dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed").

In support of its contention that we can give § 1231(a)(6) a different meaning when it is applied to nonadmitted aliens, the Government relies most prominently upon our decision in *Crowell* v. *Benson,* 285 U. S. 22 (1932). Brief for Petitioners in No. 03–878, p. 29; Brief for Respondent in No. 03–7434, p. 29. That case involved a statutory provision that gave the Deputy Commissioner of the United States Employees' Compensation Commission " 'full power and authority to hear and determine all questions in respect of' " claims under the Longshoremen's and Harbor Workers' Compensation Act. 285 U. S., at 62. The question presented was whether this provision precluded review of the Deputy Commissioner's determination that the claimant was an employee, and hence covered by the Act. The Court held that, although the statute could be read to bar judicial review altogether, it was also susceptible of a narrower reading that permitted judicial review of the fact of employment, which was an "essential condition precedent to the right to make the claim." *Ibid.* The Court adopted the latter construction in order to avoid serious constitutional questions that it believed would

be raised by total preclusion of judicial review. *Ibid.* This holding does *not* produce a statute that bears two different meanings, depending on the presence or absence of a constitutional question. Always, and as applied to all claimants, it permits judicial review of the employment finding. What corresponds to *Crowell* v. *Benson*'s holding that the fact of employment is judicially reviewable is *Zadvydas*'s holding that detention cannot be continued once removal is no longer reasonably foreseeable—and like the one, the other applies in all cases.

The dissent, on the other hand, relies on our recent cases interpreting 28 U. S. C. § 1367(d). *Raygor* v. *Regents of Univ. of Minn.*, 534 U. S. 533 (2002), held that this provision does not include, in its tolling of limitations periods, claims against States that have not waived their immunity from suit in federal court because the statutory language fails to make "'"unmistakably clear,"'" as it must in provisions subjecting States to suit, that such States were covered. *Id.*, at 543–546. A subsequent decision, *Jinks* v. *Richland County*, 538 U. S. 456 (2003), held that the tolling provision *does* apply to claims against political subdivisions of States, since the requirement of the unmistakably clear statement did not apply to those entities. *Id.*, at 466. This progression of decisions does not remotely establish that § 1367(d) has two different meanings, equivalent to the unlimited-detention/limited-detention meanings of § 1231(a)(6) urged upon us here. They hold that the single and unchanging disposition of § 1367(d) (the tolling of limitations periods) does not apply to claims against States that have not consented to be sued in federal court.[6]

---

[6] The dissent concedes this is so but argues, *post*, at 393–394, that, because the Court reached this conclusion "only after analyzing whether the constitutional doubts at issue in *Raygor* applied to the county defendant" in *Jinks*, *post*, at 394, we must engage in the same quasi-constitutional analysis here before applying the construction adopted in *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), to the aliens in these cases. This overlooks a

We also reject the Government's argument that, under *Zadvydas*, § 1231(a)(6) "authorizes detention until it approaches constitutional limits." Brief for Petitioners in No. 03–878, at 27–28; Brief for Respondent in No. 03–7434, at 27–28. The Government provides no citation to support that description of the case—and none exists. *Zadvydas* did not hold that the statute authorizes detention until it approaches constitutional limits; it held that, *since* interpreting the statute to authorize indefinite detention (one plausible reading) would approach constitutional limits, the statute should be read (in line with the other plausible reading) to authorize detention only for a period consistent with the purpose of effectuating removal. 533 U. S., at 697–699. If we were, as the Government seems to believe, free to "interpret" statutes as becoming inoperative when they "approach constitutional limits," we would be able to spare ourselves the necessity of ever finding a statute unconstitutional as applied. And the doctrine that statutes should be construed to contain substantive dispositions that do not raise constitutional difficulty would be a thing of the past; no need for such caution, since—*whatever* the substantive dispositions are— they become inoperative when constitutional limits are "ap-

critical distinction between the question before the Court in *Jinks* and the one before us today. In *Jinks,* the county could not claim the aid of *Raygor* itself because *Raygor* held only that § 1367(d) did not include suits against nonconsenting *States;* instead, the county argued *by analogy to Raygor* that, absent a clear statement of congressional intent, § 1367(d) should be construed not to include suits against political subdivisions of States. And thus the Court in *Jinks* considered not whether *Raygor's* interpretation of § 1367(d) was directly controlling but whether the constitutional concerns that justified the requirement of a clear statement in *Raygor* applied as well in the case of counties. In the present cases, by contrast, the aliens ask simply that the interpretation of § 1231(a)(6) announced in *Zadvydas* be applied to them. This question does not compel us to compare analogous constitutional doubts; it simply requires that we determine whether the statute construed by *Zadvydas* permits any distinction to be drawn between aliens who have been admitted and aliens who have not.

proached." That is not the legal world we live in. The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them.* See, *e. g., Almendarez-Torres* v. *United States,* 523 U. S. 224, 237–238 (1998); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909). In *Zadvydas,* it was the statute's text read in light of its purpose, not some implicit statutory command to avoid approaching constitutional limits, which produced the rule that the Secretary may detain aliens only for the period reasonably necessary to bring about their removal. See 533 U. S., at 697–699.

In passing in its briefs, but more intensively at oral argument, the Government sought to justify its continued detention of these aliens on the authority of § 1182(d)(5)(A).[7] Even assuming that an alien who is subject to a final order of removal is an "alien applying for admission" and therefore eligible for parole under this provision, we find nothing in this text that affirmatively authorizes detention, much less indefinite detention. To the contrary, it provides that, when parole is revoked, "the alien shall . . . be returned to the custody from which he was paroled and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission." Ibid.* (emphasis

---

[7] Section 1182(d)(5)(A) reads as follows:

"The [Secretary] may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the [Secretary], have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."

added). The manner in which the case of any other applicant would be "dealt with" beyond the 90-day removal period is prescribed by § 1231(a)(6), which we interpreted in *Zadvydas* and have interpreted above.

\* \* \*

The Government fears that the security of our borders will be compromised if it must release into the country inadmissible aliens who cannot be removed. If that is so, Congress can attend to it.[8] But for this Court to sanction indefinite detention in the face of *Zadvydas* would establish within our jurisprudence, beyond the power of Congress to remedy, the dangerous principle that judges can give the same statutory text different meanings in different cases.

Since the Government has suggested no reason why the period of time reasonably necessary to effect removal is longer for an inadmissible alien, the 6-month presumptive detention period we prescribed in *Zadvydas* applies. See 533 U. S., at 699–701. Both Martinez and Benitez were detained well beyond six months after their removal orders became final. The Government having brought forward nothing to indicate that a substantial likelihood of removal subsists despite the passage of six months (indeed, it concedes that it is no longer even involved in repatriation negotiations with Cuba); and the District Court in each case having determined that removal to Cuba is not reasonably foreseeable; the petitions for habeas corpus should have been

---

[8] That Congress has the capacity to do so is demonstrated by its reaction to our decision in *Zadvydas*. Less than four months after the release of our opinion, Congress enacted a statute which expressly authorized continued detention, for a period of six months beyond the removal period (and renewable indefinitely), of any alien (1) whose removal is not reasonably foreseeable and (2) who presents a national security threat or has been involved in terrorist activities. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT ACT), § 412(a), 115 Stat. 350 (enacted Oct. 26, 2001) (codified at 8 U. S. C. § 1226a(a)(6) (2000 ed., Supp. II)).

granted. Accordingly, we affirm the judgment of the Ninth Circuit, reverse the judgment of the Eleventh Circuit, and remand both cases for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I join the Court's opinion. I write separately to emphasize that, even under the current statutory scheme, it is possible for the Government to detain inadmissible aliens for more than six months after they have been ordered removed. For one thing, the 6-month presumption we described in *Zadvydas* v. *Davis,* 533 U. S. 678 (2001), is just that—a presumption. The Court notes that the Government has not suggested here any reason why it takes longer to effect removal of inadmissible aliens than it does to effect removal of other aliens. It is conceivable, however, that a longer period *is* "reasonably necessary," *id.,* at 689, to effect removal of inadmissible aliens as a class. If the Government shows that to be true, then detention beyond six months will be lawful within the meaning we ascribed to 8 U. S. C. § 1231(a)(6) in *Zadvydas.*

Moreover, the Government has other statutory means for detaining aliens whose removal is not foreseeable and whose presence poses security risks. Upon certifying that he has "reasonable grounds to believe" an alien has engaged in certain terrorist or other dangerous activity specified by statute, 8 U. S. C. § 1226a(a)(3) (2000 ed., Supp. II), the Secretary of Homeland Security may detain that alien for successive 6-month periods "if the release of the alien will threaten the national security of the United States or the safety of the community or any person," § 1226a(a)(6).

Finally, any alien released as a result of today's holding remains subject to the conditions of supervised release. See § 1231(a)(3); 8 CFR § 241.5 (2004). And, if he fails to comply with the conditions of release, he will be subject to crim-

inal penalties—including further detention. See 8 U. S. C. § 1253(b); *Zadvydas, supra,* at 695 ("[W]e nowhere deny the right of Congress . . . to subject [aliens] to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions").

JUSTICE THOMAS, with whom THE CHIEF JUSTICE joins as to Part I–A, dissenting.

Title 8 U. S. C. § 1231(a)(6) states that aliens whom the Secretary of Homeland Security has ordered removed "may be detained beyond the removal period." Nevertheless, in *Zadvydas* v. *Davis,* 533 U. S. 678 (2001), this Court construed this provision "to contain an implicit 'reasonable time' limitation" on the Secretary's power to detain admitted aliens "[b]ased on our conclusion that indefinite detention of" those aliens "would raise serious constitutional concerns." *Id.,* at 682. "Aliens who have not yet gained initial admission to this country," the Court assured us, "would present a very different question." *Ibid.*

Today, the Court holds that this constitutional distinction—which "made all the difference" to the *Zadvydas* Court, *id.,* at 693—is actually irrelevant, because "[t]he operative language of § 1231(a)(6) . . . applies without differentiation to all three categories of aliens that are its subject." *Ante,* at 378. While I wholeheartedly agree with the Court's fidelity to the text of § 1231(a)(6), the Court's analysis cannot be squared with *Zadvydas.* And even if it could be so squared, *Zadvydas* was wrongly decided and should be overruled. I respectfully dissent.

## I

I begin by addressing the majority's interpretation of *Zadvydas.* The Court's interpretation is not a fair reading of that case. It is also not required by any sound principle of statutory construction of which I am aware. To the con-

trary, what drives the majority's reading is a novel "lowest common denominator" principle. *Ante*, at 380.

## A

The majority's reading of *Zadvydas* is implausible. *Zadvydas* held that interpreting § 1231(a)(6) to authorize indefinite detention of admitted aliens later found removable would raise serious due process concerns. 533 U. S., at 690–696. The Court therefore read the statute to permit the Attorney General (now the Secretary of Homeland Security) to detain admitted aliens only as long as reasonably necessary to remove them from the country. *Id.*, at 699.

The majority concedes that *Zadvydas* explicitly reserved the question whether its statutory holding as to *admitted* aliens applied equally to *inadmissible* aliens. *Ante*, at 379. This reservation was front and center in *Zadvydas*. It appeared in the introduction and is worth repeating in full:

> "In these cases, we must decide whether [§ 1231(a)(6)] authorizes the Attorney General to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal. We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question. Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review." 533 U. S., at 682 (citation omitted; emphasis in original).

The Court reserved this question because the *constitutional* questions raised by detaining inadmissible aliens are different from those raised by detaining admitted aliens. It stated that the detention period in § 1231(a)(6) was limited

because it "read [the statute] in light of the Constitution's demands." *Id.*, at 689. And it repeatedly emphasized constitutional distinctions among various groups of aliens, for which § 1231(a)(6) makes no distinctions. See *id.*, at 693–694 (noting the different constitutional considerations applicable to inadmissible and admissible aliens); *id.*, at 695 (noting that "the cases before us [do not] require us to consider the political branches' authority to control entry into the United States"); *id.*, at 696 (noting that the opinion did not "consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security").

The majority's reading of *Zadvydas* is inconsistent with these qualifications. If it were true that *Zadvydas*' interpretation of § 1231(a)(6) applied to all aliens regardless of the constitutional concerns involved in each case, then the question of how § 1231(a)(6) applies to them would not be "very different" depending on the alien before the Court. The question would be trivial because the text of § 1231(a)(6) plainly does not distinguish between admitted and nonadmitted aliens. There would also have been no need for the Court to go out of its way to leave aside "terrorism or other special circumstances," *ibid.*, or to disavow "consider-[ation of] the political branches' authority to control entry into the United States," *id.*, at 695, for the construction the majority extracts from *Zadvydas* would have applied across the board, *ibid.* And the Court's rationalization that its construction would therefore "leave no unprotected spot in the Nation's armor," *id.*, at 695–696 (internal quotation marks omitted), would have been incorrect. The constitutional distinctions that pervade *Zadvydas* are evidence that the "very different" statutory question it reserved turned on them.

The *Zadvydas* Court thus tethered its reading of § 1231(a)(6) to the specific class of aliens before it. The term this Court read into the statute was not simply a presump-

tive 6-month period, but a presumptive 6-month period for admitted aliens. Its reading of the statute "in light of the Constitution's demands," *id.*, at 689, that is, depended on the constitutional considerations at work in *"the cases before [it],"* *id.*, at 695 (emphasis added). One would expect the Court today, then, to follow the same two-step procedure it employed in *Zadvydas.* It should first ask whether the statute is ambiguous and, if so, whether one of the possible interpretations raises constitutional doubts as applied to respondent Martinez and petitioner Benitez. Step one is dictated by *Zadvydas:* Section 1231(a)(6) is not clear on whether it permits indefinite detention. The Court should then move to the second step and ask whether either of the statute's possible interpretations raises constitutional doubts as applied to Benitez and Martinez. If so, the Court would apply avoidance to adopt the interpretation free from constitutional doubt (as *Zadvydas* itself did).

The Court's reasons for departing from this reading of *Zadvydas* are unpersuasive. The Court says that its reading is necessary to avoid "invent[ing] a statute rather than interpret[ing] one," *ante,* at 378; to preclude "giving the *same* detention provision a different meaning" depending on the aliens before the Court, *ante,* at 380 (emphasis in original); and to forestall establishing "the dangerous principle that judges can give the same statutory text different meanings in different cases," *ante,* at 386. I agree that we should adopt none of these principles, but this is no warrant for the reading of *Zadvydas* that the majority advocates. *Zadvydas* established a single and unchanging, if implausible, meaning of § 1231(a)(6): that the detention period authorized by § 1231(a)(6) depends not only on the circumstances surrounding a removal, but also on the type of alien ordered removed.

I grant that this understanding of *Zadvydas* could result in different detention periods for different classes of aliens— indefinite detention for some, limited detention for others.

But it does not follow that this reads the meaning of the statute to "change" depending on the alien involved, any more than the meaning of the statute could be said to "change" simply because the time that is "reasonably necessary to effect removal" may differ depending on the type of alien involved, as both the Court's opinion, *ante*, at 386, and JUSTICE O'CONNOR's concurring opinion, *ante*, at 387, concede it may. A statute's sense is the same even if what it requires depends on factual context.

In support of its reading of *Zadvydas*, the Court relies on a statement in a dissent in *Zadvydas* that § 1231(a)(6) could not be given a different reading for inadmissible aliens. *Ante*, at 379–380 (citing 533 U. S., at 710–711, 717 (opinion of KENNEDY, J.)). That dissenting view, as the very quotation the majority stresses demonstrates, rested on the dissent's premise that "it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not to another." *Id.*, at 710. But the *Zadvydas* majority disagreed with that assumption and adopted a contrary interpretation of § 1231(a)(6). For as the dissent recognized, *Zadvydas*' "logic might be that inadmissible and removable aliens can be treated differently." *Ibid.* That was *Zadvydas*' logic precisely, as its repeated statements limiting its decision to inadmissible aliens show. To interpret *Zadvydas* properly, we must take its logic as given, not the logic of the *reductio ad absurdum* of *Zadvydas* that I joined in dissent.

### B

The majority strains to recharacterize *Zadvydas* because it thinks that "[i]t is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation." *Ante*, at 380. In other words, it claims, "[t]he lowest common denominator, as it were, must govern." *Ibid.* I disagree.

As an initial matter, this principle is inconsistent with *Zadvydas* itself. As explained above, the limiting construction *Zadvydas* adopted as to admitted aliens does not necessarily govern the other applications of § 1231(a)(6). If the majority is correct that the "lowest common denominator" governs, then the careful distinction *Zadvydas* drew between admitted aliens and nonadmitted aliens was irrelevant at best and misleading at worst. Under this reading, *Zadvydas* would have come out the same way even if it had involved inadmissible aliens, for the "lowest common denominator" of the statute remains the same regardless of the identity of the alien before the Court. Again, this understanding of *Zadvydas* is implausible.

Beyond *Zadvydas*, the Court offers scant support for the idea that statutes should be stripped down to their "lowest common denominator[s]." It attempts to distinguish *Jinks* v. *Richland County*, 538 U. S. 456 (2003), and *Raygor* v. *Regents of Univ. of Minn.*, 534 U. S. 533 (2002), *ante*, at 383, and n. 6, yet these cases employed exactly the procedure that the majority today says is impermissible. They construed 28 U. S. C. § 1367(d),[1] a tolling provision, to apply to States and political subdivisions of States only to the extent that doing so would raise a constitutional doubt as applied to either entity. *Jinks* was explicit on this point:

> "Although we held in *[Raygor]* that § 1367(d) does not apply to claims filed in federal court against *States* but subsequently dismissed on sovereign immunity grounds, we did so to avoid interpreting the statute in a manner that would raise 'serious constitutional doubt' in light of our decisions protecting a *State's* sovereign immunity

---

[1] Section 1367(d) provides that "[t]he period of limitations for any claim asserted under [§ 1367(a)], and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under [§ 1367(a)], shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

from congressional abrogation .... [N]o such constitutional doubt arises from holding that petitioner's claim against respondent—which is not a State, but a political subdivision of a State—falls under the definition of '*any claim* asserted under subsection (a) [of § 1367].'" 538 U. S., at 466 (emphasis in original).

This passage reads the meaning of § 1367(d)—which applies to "any claim asserted under subsection (a)" of § 1367—to hinge on the constitutional context. The Court is correct that *Jinks* and *Raygor* "hold that the single and unchanging disposition of § 1367(d) . . . does not apply to claims against States." *Ante*, at 383. But as the Court concedes, *Jinks* reached that holding only after analyzing whether the constitutional doubts at issue in *Raygor* applied to the county defendant. *Ante*, at 383–384, n. 6. The Court's failure to do the same here cannot be reconciled with *Jinks* and *Raygor*: the Court should ask whether the constitutional concerns that justified the requirement of a clear statement in *Zadvydas* apply as well to inadmissible aliens.

The Court's "lowest common denominator" principle is also in tension with *Salinas* v. *United States*, 522 U. S. 52 (1997). There, we rejected an argument that the federal bribery statute, 18 U. S. C. § 666(a)(1)(B), should be construed to avoid constitutional doubts, in part on the ground that there was "no serious *doubt* about the constitutionality of § 666(a)(1)(B) as applied to the facts of this case." 522 U. S., at 60 (emphasis added). Unlike the Court's approach to avoidance today, we disclaimed examination of the constitutionality of applications not before the Court: "Whatever might be said about § 666(a)(1)(B)'s application in other cases, the application of § 666(a)(1)(B) . . . did not extend federal power beyond its proper bounds." *Id.*, at 61. The Court is mistaken that this passage in *Salinas* was a rejection of a constitutional argument on its merits. *Ante*, at 381, n. 5. Salinas, the petitioner, phrased his question presented solely in terms of the proper statutory interpretation of

§ 666(a)(1)(B), Brief for Petitioner, O. T. 1996, No. 96–738, p. i, and never claimed that the statute was unconstitutional, see generally *ibid.*

## C

More importantly, however, the Court's "lowest common denominator" principle is inconsistent with the history of the canon of avoidance and is likely to have mischievous conse-quences. The modern canon of avoidance is a doctrine under which courts construe ambiguous statutes to avoid constitutional doubts, but this doctrine has its origins in a very different form of the canon. Traditionally, the avoidance canon was not a doctrine under which courts read statutes to avoid mere constitutional doubts. Instead, it commanded courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading.[2] The traditional version of the canon thus requires courts to reach the issue whether the doubtful version of the statute is constitutional before adopting the construction that saves the statute from constitutional invalidity. A court faced with an ambiguous statute applies traditional avoidance by asking whether, given two plausible interpretations of that statute, one would be unconstitutional *as applied to the plaintiff;* and, if that interpretation is actually unconstitutional as applied to the plaintiff, the court picks the other (constitutional) read-

---

[2] See *Rust* v. *Sullivan,* 500 U. S. 173, 190–191 (1991) (distinguishing the classic and modern versions of the canon and citing cases); *Hooper* v. *California,* 155 U. S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality"); *Mossman* v. *Higginson,* 4 Dall. 12, 14 (1800) (reasoning that the statute under review "can, and must receive a construction, consistent with the constitution"); *Ex parte Randolph,* 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, J.); Vermeule, Saving Constructions, 85 Geo. L. J. 1945, 1949 (1997); H. Black, Handbook on the Construction and Interpretation of the Laws 113–114 (2d ed. 1911). The modern version seems to have originated in *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909).

ing. The court does not inquire whether either of the interpretations would be unconstitutional if applied to third parties not before the court, unless the challenge is facial or otherwise implicates third-party rights.

This history suggests that the "lowest common denominator" principle is mistaken. Courts applying the modern version of the canon of avoidance should no more look to the rights of third parties than do courts using the traditional version. Under modern avoidance, in other words, an ambiguous statute should be read to avoid a constitutional doubt only if the statute is constitutionally doubtful as applied to the litigant before the court (again, unless the constitutional challenge involves third-party rights). Yet the Court's lowest common denominator principle allows a limiting construction of an ambiguous statute prompted by constitutional doubts to infect other applications of the statute—even if the statute raises no constitutional doubt as applied to the specific litigant in a given case and even if the constitutionally unproblematic application of the statute to the litigant is severable from the constitutionally dubious applications. The lowest common denominator principle thus allows an end run around black-letter constitutional doctrine governing facial and as-applied constitutional challenges to statutes: A litigant ordinarily cannot attack statutes as constitutionally invalid based on constitutional doubts concerning other litigants or factual circumstances.

The Court misses the point by answering that the canon of constitutional avoidance "is not a method of adjudicating constitutional questions by other means," and that the canon rests on a presumption that "Congress did not intend the alternative which raises serious constitutional doubts." *Ante*, at 381. That is true, but in deciding whether a plausible interpretation "raises serious constitutional doubts," a court must employ the usual rules of constitutional adju-

dication. See *ante*, at 380–381 (noting that whether an interpretation is constitutionally doubtful turns on whether it raises "a multitude of constitutional problems"); *Zadvydas*, 533 U. S., at 690–696 (extensively employing constitutional analysis). Those rules include doctrines governing third-party constitutional challenges and the like. Moreover, the reason that courts perform avoidance at all, in any form, is that we assume "Congress intends statutes to have effect to the full extent the Constitution allows." *United States* v. *Booker, ante*, at 320 (THOMAS, J., dissenting in part). Only my approach would extend § 1231(a)(6) to its full constitutional bound consistent with modern avoidance, by narrowing the statute on a case-by-case basis only if constitutional concerns are actually present. By contrast, under the majority's lowest common denominator principle, a statute like § 1231(a)(6) must be narrowed once and for all based on constitutional concerns that may never materialize. In short, once narrowed in *Zadvydas*, § 1231(a)(6) now limits the Executive's power to detain unadmitted aliens—even though indefinite detention of unadmitted aliens may be perfectly constitutional.

All of this shows why the sole support the majority offers for its lowest common denominator principle can be squared with my analysis. That support is a plurality opinion of this Court (reaffirmed by footnote dictum in *Leocal* v. *Ashcroft, ante*, at 11–12, n. 8), that stated that the rule of lenity applies to statutes so long as they have some criminal applications. *Ante*, at 380 (citing *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505, 517 (1992)). To the extent that the rule of lenity is a constitutionally based clear statement rule, it is like vagueness doctrine, as its purpose is to ensure that those subjected to criminal prosecution have adequate notice of the conduct that the law prohibits. Cf., *e. g.*, *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931). *Thompson/Center Arms* is thus distinguishable, because our rules governing third-

party challenges (rightly or wrongly) are more lenient in vagueness cases.[3] *Zadvydas,* by contrast, was a straightforward as-applied constitutional challenge. It concerned a constitutional doubt that arose from § 1231(a)(6)'s application to the respondents there, not its hypothetical application to other aliens, as its careful distinction between admitted and inadmissible aliens shows. To the extent that the rule of lenity is a nonconstitutionally based presumption about the interpretation of criminal statutes, the *Thompson/Center Arms* interpretive principle is fundamentally different from the canon of constitutional avoidance, because the rule of lenity is wholly independent of the rules governing constitutional adjudication. Either way, this case does not support the majority's restatement of modern avoidance principles.

The cases at bar illustrate well the exception to the normal operation of as-applied constitutional adjudication that the Court's approach creates. Congress explicitly provided that unconstitutional applications of § 1231(a)(6) should be severed from constitutional applications.[4] Congress has thus indicated that courts should examine whether § 1231(a)(6) raises a constitutional doubt application by application. After all, under the severability clause, if *Zadvydas* had held unconstitutional the indefinite detention of respondents Zadvydas and Ma, the constitutionality of the Secretary's indefinite detention of Benitez and Martinez would remain an open question. Although *Zadvydas* did not formally hold § 1231(a)(6) to be unconstitutional as applied to the aliens before it, the same procedure should be followed when analyz-

---

[3] See, *e. g., Chicago* v. *Morales,* 527 U. S. 41, 55, and n. 22 (1999) (plurality opinion); *Kolender* v. *Lawson,* 461 U. S. 352, 358–359, n. 8 (1983); *Papachristou* v. *Jacksonville,* 405 U. S. 156 (1972).

[4] "If any provision of this division . . . or the application of such provision to any person or circumstances is held to be unconstitutional, the remainder of this division and the application of the provisions of this division to any person or circumstance shall not be affected thereby." Note following 8 U. S. C. § 1101, p. 840 (separability).

ing whether § 1231(a)(6) raises a constitutional doubt.[5] The Court today limits applications of § 1231(a)(6) that may well be constitutional solely on the basis of constitutional doubts as to *other* applications, and despite that the severability clause contemplates application-by-application examination of the statute's constitutionality.

The Court misapprehends my interpretive approach. It suggests that I would "spare [us] the necessity of ever finding a statute unconstitutional as applied," *ante*, at 384, and "would render every statute a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case," *ante*, at 382. My approach does none of this. I simply would read ambiguous statutes to avoid as-applied constitutional doubts only if those doubts are present in the case before the Court. This leaves plenty of room for as-applied invalidation of statutes that are unambiguously unconstitutional. Nor would I permit a court to read every statute's meaning to depend on constitutional concerns. That is permissible, in my view, only if the statute is ambiguous. Granted, I am thereby guilty of leaving courts free to interpret ambiguous statutes "as becoming inoperative when they 'approach constitutional limits.'" *Ante*, at 384. That is hardly an absurd result—unless one considers the modern canon of constitutional

---

[5] *Crowell* v. *Benson*, 285 U. S. 22 (1932), bolsters my approach. Employing the canon of avoidance, the Court construed a statute in that case to allow judicial review of jurisdictional facts but not legislative facts. It did so even though the terms of the statute itself did not distinguish between the two sorts of facts. *Id.*, at 62–63. The presence of a severability provision in the statute gave "assurance that there [was] no violation of the purpose of the Congress in sustaining the determinations of fact of the deputy commissioner where he acts within his authority in passing upon compensation claims while denying finality to his conclusions as to the jurisdictional facts upon which the valid application of the statute depends." *Ibid.* So too here, the presence of a severability provision should reassure the Court that applying *Zadvydas'* limiting construction of § 1231(a)(6) to some aliens and not others is consistent with the statute.

avoidance itself to be absurd. Every application of that canon, by rejecting a plausible interpretation of a statute, reads the statute to be inoperative to the extent it raises a constitutional doubt or "limit."

In truth, the Court's aggressive application of modern constitutional avoidance doctrine poses the greater danger. A disturbing number of this Court's cases have applied the canon of constitutional doubt to statutes that were on their face clear. See, e. g., INS v. St. Cyr, 533 U. S. 289, 327–336 (2001) (SCALIA, J., dissenting); Public Citizen v. Department of Justice, 491 U. S. 440, 481–482 (1989) (KENNEDY, J., concurring in judgment); Lowe v. SEC, 472 U. S. 181, 212–213 (1985) (White, J., concurring in result). This Court and others may now employ the "lowest common denominator" approach to limit the application of statutes wholesale by searching for hypothetical unconstitutional applications of them—or, worse yet, hypothetical constitutional doubts—despite the absence of any facial constitutional problem (at least, so long as those hypothetical doubts pose "a multitude of constitutional problems," ante, at 380–381). This is so even if Congress has expressed its clear intent that unconstitutional applications should be severed from constitutional applications, regardless of whether the challenger has third-party standing to raise the constitutional issue, and without the need to engage in full-fledged constitutional analysis.

This danger is real. In St. Cyr, this Court held that the Immigration and Nationality Act (INA) did not divest district courts of jurisdiction under 28 U. S. C. §2241 over habeas actions filed by criminal aliens to challenge removal orders, 533 U. S., at 314. The Court did so because it thought that otherwise the statute would preclude any avenue of judicial review of removal orders of criminal aliens, thus raising a serious Suspension Clause question. Id., at 305. This was a construction of (among other provisions) 8 U. S. C. §§ 1252(a)(1) and 1252(b)(9), and 28 U. S. C. §2241, none of which distinguishes between criminal and noncriminal

aliens. 533 U. S., at 308–314. The INA, however, clearly allows noncriminal aliens, unlike criminal aliens, a right to judicial review of removal decisions in the courts of appeals under the review provisions of § 1252(a)(1), and *St. Cyr* involved only criminal aliens. After *St. Cyr*, therefore, one would have thought that "noncriminal aliens seeking to challenge their removal orders . . . [would] still presumably be required to proceed directly to the court of appeals by way of petition for review, under the restrictive modified Hobbs Act review provisions set forth in § 1252(a)(1)," rather than sue directly under the habeas statute. *Id.*, at 335 (SCALIA, J., joined by REHNQUIST, C. J., and O'CONNOR and THOMAS, JJ., dissenting). Yet lower courts, relying on a version of the Court's "lowest common denominator" principle, have held just the opposite: They have entertained noncriminal aliens' habeas actions challenging removal orders. *Chmakov* v. *Blackman*, 266 F. 3d 210, 214–215 (CA3 2001); see also *Riley* v. *INS*, 310 F. 3d 1253, 1256 (CA10 2002); *Liu* v. *INS*, 293 F. 3d 36, 38–41 (CA2 2002). The logic in allowing noncriminal aliens, who have a right to judicial review of removal decisions, to take advantage of constitutional doubt that arises from precluding any avenue of judicial review for criminal aliens, see *St. Cyr, supra*, at 305, escapes me.

## II

The Court is also mistaken in affording *Zadvydas* stare decisis effect. *Zadvydas* was wrong in both its statutory and its constitutional analysis for the reasons expressed well by the dissents in that case. See 533 U. S., at 705–718 (opinion of KENNEDY, J.); *id.*, at 702–705 (opinion of SCALIA, J.). I continue to adhere to those views and will not repeat the analysis of my colleagues. I write only to explain why I do not consider *Zadvydas* to bind us.

*Zadvydas* cast itself as a statutory case, but that fact should not prevent us from overruling it. It is true that we give stronger *stare decisis* effect to our holdings in statutory

cases than in constitutional cases. See, *e. g., Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 205 (1991). This rule, however, is not absolute, and we should not hesitate to allow our precedent to yield to the true meaning of an Act of Congress when our statutory precedent is "unworkable" or "badly reasoned." *Holder* v. *Hall*, 512 U. S. 874, 936 (1994) (THOMAS, J., concurring in judgment) (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991); internal quotation marks omitted). "[W]e have never applied *stare decisis* mechanically to prohibit overruling our earlier decisions determining the meaning of statutes." *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 695 (1978). The mere fact that Congress can overturn our cases by statute is no excuse for failing to overrule a statutory precedent of ours that is clearly wrong, for the realities of the legislative process often preclude readopting the original meaning of a statute that we have upset.

*Zadvydas*' reading of § 1231(a)(6) is untenable. Section 1231(a)(6) provides that aliens whom the Secretary of Homeland Security has ordered removed "may be detained beyond the removal period." There is no qualification to this authorization, and no reference to a "reasonable time" limitation. Just as we exhaust the aid of the "traditional tools of statutory construction," *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843, n. 9 (1984), before deferring to an agency's interpretation of a statute, so too should we exhaust those tools before deciding that a statute is ambiguous and that an alternative plausible construction of the statute should be adopted.

Application of those traditional tools begins and ends with the text of § 1231(a)(6). *Zadvydas*' observation that "if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms," 533 U. S., at 697, proves nothing. Congress could have spoken more clearly in any statutory case in which the statute does not mention the particular factual scenario be-

fore the Court. Congress provided for a "reasonable time" limit to detentions pending removal in other portions of § 1231. *Id.*, at 708 (KENNEDY, J., dissenting). Its failure to do the same in § 1231(a)(6) confirms what is unmistakable from its terms: that there is no time limit on the Secretary's power to detain aliens. There is no textually evident alternative construction that would avoid the constitutional doubts identified by the majority.

Even apart from the Court's incredible reading of § 1231(a)(6), the normal reason for affording our statutory holdings strong *stare decisis* effect—that Congress is free to overrule them if it disagrees—does not apply to *Zadvydas*. *Zadvydas* is a statutory case in name only. Although the *Zadvydas* majority purported to find indefinite detention only constitutionally doubtful, its lengthy analysis strongly signaled to Congress that indefinite detention of admitted aliens would be unconstitutional. Indeed, far from avoiding that constitutional question in *Zadvydas*, the Court took it head on, giving it extended treatment. *Id.*, at 690–697; but see *ante*, at 381 (noting the "fundamenta[l]" tenet that "[t]he canon [of constitutional avoidance] is not a method of adjudicating constitutional questions by other means"). *Zadvydas* makes clear that the Court thought indefinite detention to be more than constitutionally suspect, and there is evidence that some Members of Congress understood as much.[6] This is why the Court's assurance that if "the security of our bor-

---

[6] See H. R. Conf. Rep. No. 108–10, p. 600 (2003) ("A recent Supreme Court decision held that criminal aliens cannot be detained indefinitely," no doubt referring to *Zadvydas*); H. R. Rep. No. 108–724, pt. 5, p. 191 (2004) ("The danger posed by the requirement that these aliens be allowed to remain in the U. S. was increased exponentially by the 2001 Supreme Court decision of *Zadvydas* v. *Davis*, in which the Court made clear that it would strike down as unconstitutional the indefinite detention by [the Secretary] of aliens with removal orders whose countries will not take them back, except in the most narrow of circumstances" (footnote omitted)); 147 Cong. Rec. 20729 (2001) ("Indefinite detention of aliens is permitted only in extraordinary circumstances," citing *Zadvydas*).

ders will be compromised if [the United States] must release into the country inadmissible aliens who cannot be removed[,] Congress can attend to it," *ante,* at 386, rings hollow. Short of constitutional amendment, it is only within the power of this Court to correct *Zadvydas'* error.

The Court points to 8 U. S. C. § 1226a(a)(6) (2000 ed., Supp. II), a statute that Congress passed shortly after *Zadvydas,* as evidence that Congress can correct *Zadvydas'* mistake. *Ante,* at 386, n. 8. This statute only confirms my concern that *Zadvydas* is legislatively uncorrectable. Section 1226a(a)(6) authorizes detention for a period of six months beyond the removal period of aliens who present a national security threat, but only to the extent that those aliens' removal is not reasonably foreseeable. *Ante,* at 386, n. 8. Yet *Zadvydas* conceded that indefinite detention might not violate due process in "certain special and narrow nonpunitive circumstances . . . where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." 533 U. S., at 690 (internal quotation marks omitted). Moreover, *Zadvydas* set a 6-month presumptive outer limit on the detention power. *Id.,* at 701. Congress crafted § 1226a(a)(6) to operate within the boundaries *Zadvydas* set. This provision says nothing about whether Congress may authorize detention of aliens for greater lengths of time or for reasons the Court found constitutionally problematic in *Zadvydas.*

\*     \*     \*

For the foregoing reasons, I would affirm the judgment of the Eleventh Circuit and reverse the judgment of the Ninth Circuit. I therefore respectfully dissent.